IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIAM W. HORSMAN, #110184,    )
    )
    Plaintiff,    )
    )
v.    )    CASE NO. 2:11-CV-769-MHT
    )    [WO]
    )
ROBERT BENTLEY, *et al.*,    )
    )
    Defendants.    )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by William W. Horsman challenging conditions of confinement and actions taken against him during a prior term of incarceration at the Elmore Correctional Facility ["Elmore"].[1]  The plaintiff names Governor Robert Bentley, Commissioner Kim Thomas, Warden Leeposey Daniels, Alfreda Hooks, a kitchen steward at Elmore, correctional officers McKee, Clemons, Jamison and Lynam, Correctional Medical Services, now known as Corizon, Inc., and Dr. Hood as defendants in this cause of action.[2]  The plaintiff seeks a declaratory judgment, injunctive relief, monetary damages, both compensatory and punitive, and "any and all other relief the Court deems just and equitable." *Complaint - Doc. No. 1-6* at 14-

---

[1]Horsman was transferred to the Limestone Correctional Facility on July 15, 2011 and remains incarcerated at such facility.

[2]In the interest of clarity, any reference herein to "the correctional defendants" includes Governor Robert Bentley along with defendants Thomas, Daniels, McKee, Clemons, Hooks, Jamison and Lynam.

15.  The court construes this latter "catch all" request for relief as one which encompasses a request for nominal damages.  *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages .").

The defendants filed special reports and supporting evidentiary materials addressing the plaintiff's claims for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to treat each of these reports as a motion for summary judgment.  *Order of February 16, 2012 - Doc. No. 59*.  Thus, this case is now pending on the defendants' motions for summary judgment.  Upon consideration of these motions, the evidentiary materials filed in support thereof and the plaintiff's response, the court concludes that the defendants' motions for summary judgment are due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th  Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[3] The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant

---

[3]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*. "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.") A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities [and medical personnel]. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted). Consequently, to survive the defendants' properly supported motions for summary judgment, Horsman is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id*. at 249-50. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore,

do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment"); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363

F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine dispute of material fact, nonmoving party must

6

produce evidence such that reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Horsman's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Horsman fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment.

### III.  DISCUSSION OF CLAIMS[4]

#### A.  Claims for Relief - Eighth Amendment

In his complaint, Horsman alleges that during his incarceration at Elmore the facility was overcrowded, understaffed and underfunded causing a myriad of alleged unconstitutional conditions. The challenged conditions include the following: (a) The physical plant of Elmore is constructed solely of Styrofoam, a few concrete blocks and paint; (b) Elmore is housing almost double the number of inmates beyond its original

---

[4]Although in his affidavits filed in response to the defendants' special reports Horsman presented additional claims for relief against defendant Jamison, this court limits its review to the allegations set forth in the complaint and amendment thereto filed in this case. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Sec'y, Fla. Dep't of Corrs.*, 502 F. App'x 905, 909-10 (11th Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (district court correctly refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

design capacity; (c) The facility stays in a state of disrepair and repairs are not properly undertaken, i.e., "jerry-rigging and band-aid methods are used to make repairs when problems arise."; (d) Yard space has been reduced due to security concerns; (e) Inmates are subject to excessive heat as only a few fans are available to cool the dorms; (f) Guards sometimes sleep while on duty; (g) Inmates break institutional rules "sodomizing each other, tattooing each other with Hepatitis-C infected needles, gambling, smoking both cigarettes and dope, talking on cell phones."; (h) Pigeons and other birds leave droppings on the yard and the outer walls of the facility; (i) Odors emit from the drains at Elmore and the compost area of the nearby recycling plant; (j) Underground pipes break and leak due to shifting soil; (k) Hazardous materials are dumped in the compost area and at the Recycling Plant; (l) The number of toilets, urinals and showers are insufficient; (m) Mold and peeling paint are present in the bathrooms; (n) Water pressure is inadequate; (o) "There is no proper lock-up cell at Elmore . . . ."  Officials utilize a small room with no running water or toilet to hold troublesome inmates; (p) Inmates in lock-up for altercations with other inmates gain release from the "make shift lock up cell . . . by signing an <u>illegal</u> 'Living Agreement'" indicating that they will not "again or injure each other.";[5] (q) The Barber Shop at Elmore is housed in an old guard shack with no way for barbers to clean

---

[5]The amendment to the complaint indicates that Horsman was not in lock-up for an altercation with another inmate but was housed in this room due to correctional officials obtaining information indicating that in violation of institutional rules he charged another inmate a monetary fee for performing legal work.  Thus, it does not appear that Horsman signed a living agreement to gain his release from lock-up.

their clippers and tools; (r) There are various issues with the kitchen including drainage problems, lack of a sufficient number of utensils, storage of chemicals with food items, lack of proper hygiene by kitchen staff and improper storage of food items; (s) Dietary sandwiches are not served to inmates in a sanitary manner, meal portions have steadily declined and left over food is thrown away; (t) Inmate clothing is only laundered once a week and kitchen workers are not provided adequate soap to take daily showers; (u) The health care provider "no longer provides pain management or pain meds to chronic care inmates patients[,]" and there are deficiencies in the containment of infectious diseases; (v) No medical staff is stationed at Elmore to address emergency situations; (w) At times, Horsman and other inmates were required to wait in inclement weather to receive their medications and, on occasion, other inmates received the wrong medication or no medication at all because the nurses cannot read very well; and (x) Sometimes delays occurred in Horsman's receipt of prescribed medication which is designated as keep on person ("KOP"). *Complaint - Doc. No. 1-6* at 5-13.  In an amendment to the complaint, Horsman clarified the medical treatment claims with respect to the manner in which these claims impacted his constitutional rights, expounded on his lock-up and barber shop claims, further addressed the physical conditions at Elmore, and presented additional claims alleging retaliation by the correctional defendants. *Amendment to Complaint - Doc. No. 34* at 1-7.

### B. Absolute Immunity - The Correctional Defendants

To the extent Horsman sues defendants Bentley, Thomas, Daniels, McKee, Clemons, Hooks, Jamison and Lynam in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).

> A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

*Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, the correctional defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

### C. Speculative Claims

To the extent Horsman presents claims based on a fear of conditions or actions which could have, but did not, occur during his incarceration at Elmore, do not warrant

constitutional protection.  Mere supposititious allegations that conditions *could* subsequently result in constitutional violations and/or that prison officials *may* at some time in the future act unfavorably towards an inmate fail to implicate a constitutionally protected interest. *Conner v. Sticher*, 801 F.2d 1266, 1268 (11th Cir. 1986) (plaintiff's subjective belief harm may occur provides no basis for relief); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (jurisdiction cannot be premised upon mere speculation); *Carter v. Heard*, 593 F.2d 10 (5th Cir. 1979) (Relief is not warranted when "the injury which [plaintiff's] pleadings contemplate is fancied, not real; prospective, not actual; and imagined, not threatened."). Thus, claims based on possible future adverse action are subject to dismissal as these claims are purely speculative and without constitutional implication.

### D.  Lack of Standing - Claims Alleged on Behalf of Other Inmates

Standing is a cornerstone of American jurisprudence on which jurisdiction lies. "[A] litigant may only assert his own constitutional rights or immunities."  *McGowan v. Maryland*, 366 U.S. 420, 429 (1961) (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 218-19 (1974) (plaintiff must assert a legally cognizable injury in fact before federal courts have jurisdiction).  "The essence of a standing question is whether the plaintiff has alleged 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the

11

illumination of difficult constitutional questions[.]'" *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *Harris v. McRae*, 448 U.S. 297, 320 (1981) (same).

Standing involves two aspects.  The first is the minimum "case or controversy" constitutional requirement of Article III.  *Saladin*, 812 F.2d at 690.  "To satisfy this 'irreducible' constitutional minimum required for standing, a litigant must show 1) that he personally has suffered an actual or prospective injury as a result of the putatively illegal conduct; 2) that the injury can be fairly traced to the challenged conduct; and 3) that the injury is likely to be redressed through court action."  *Id.* (citing *Valley Forge Christian Coll. v. Am. United for Separation of Church and State*, 454 U.S. 464, 472 (1982)); *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  If any element is lacking, a plaintiff's claim is not viable.  In addition, the Supreme Court has established several requirements based on prudential considerations.  *Saladin*, 812 F.2d at 690 (internal citations omitted) ("The Supreme Court has also stated that, in addition to these essential constitutional requirements, a court should consider the case in light of three principles which might counsel judicial constraint, referred to as 'prudential' considerations. . . .  Those considerations are 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately

resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties").

The instant complaint contains several claims relative to conditions of confinement, medical/mental health treatment and adverse actions by correctional officials and medical personnel to which other inmates may have been or were subjected during their confinement at Elmore. In accordance with applicable federal law as set forth herein, Horsman lacks standing to assert the constitutional rights of other persons. *Saladin*, 812 F.2d at 690; *Allen v. Wright*, 468 U.S. 737, 751 (1984). The prudential limitation applicable in this case is that a litigant may not assert the legal rights or interests of another person. With respect to the claims arising from alleged violations of other inmates' constitutional rights, Horsman is not "asserting [his] . . . own legal rights and interests [but] rather . . . the legal rights and interests of third parties." *Saladin*, 812 F.2d at 690. These claims therefore entitle Horsman to no relief and summary judgment on such claims is due to be granted in favor of the defendants.

### E.  Conditions Claims for Which Standing Exists

1. <u>Claims Challenging Conditions at Elmore</u>[6]

The correctional defendants deny that the conditions made the basis of the instant complaint rise to the level of constitutional violations. Warden Daniels addresses these

---

[6]It is clear to the court that these claims are directed solely at the correctional defendants.

claims as follows:

    1. The Plaintiff alleges that Elmore Correctional Facility houses more inmates than its original design capacity, which is true, but that fact alone or in combination with other claims, is not a constitutional violation. Additions and improvements have been added over the years to accommodate more inmates [than that of the original design capacity]. I absolutely deny that the Elmore Correctional Facility houses "too many inmates" with respect to a constitutional violation. The Facility is not in "disrepair and/or jerry-rigged". Just like any building, repairs are occasionally needed and are done in a professional manner. The building does have Styrofoam as insulation in the walls but it is not just "covered with paint and a few concrete blocks mixed in". The Facility is a sound structure and does not subject the inmates housed there to any harm or danger. If it was as the Plaintiff alleges, the facility could not secure and/or hold inmates, which it obviously does. The Plaintiff claims that "the yard size has been reduced", but does not allege how this fact violates his constitutional rights. Over the years the facility has undergone security improvements since its original construction. . . . There is sufficient room in the yard for inmates [to] exercise.

    2. The Plaintiff alleges that inmates are required to exit their dorm during hot periods of the year and this is true. Inmates are required to leave the dorms at certain times during the day so that the dorms can be cleaned [and may be placed outside for security reasons]. . . . [T]he temperature outside is sometimes hot, but [the inmates] are not required to stand in the sun for long periods of time. This again, is common with all ADOC facilities. When the temperature rises, inmates are given access to additional water and ice. . . .

    3. Inmates are required to maintain the Departmental dress code which requires that shirts be wor[n] and tucked-in when [inmates] are outside their living quarters. This is a requirement to help maintain order and so that the inmates can be quickly identified due to their AIS number having been stenciled on their shirts.

    4. I deny that inmates are "allowed to sodomize one another, tattoo each other with infected needles, smoke dope, and talk on cell phones". This kind of activity is strictly prohibited [by institutional rules], but unfortunately, it

is a fact that some inmates do these things. Security officers are constantly on the look-out for this kind of inmate activity and are diligently trying to stop this kind of activity. When [the offending inmates are caught], they face disciplinary action. Again, Inmate Horsman is making a general and non-specific claim without any names and/or dates. . . .

5. The Plaintiff alleges that pigeons cause a health hazard at the Elmore Correctional Facility. I have never heard of pigeons causing a health hazard at ECF. Pigeons, of course, do leave their droppings occasionally on the premises, . . . but [to my knowledge] it is not significant, nor is it a health hazard. . . .

6. As Warden of the Facility, I make daily rounds through the Facility. Since my tenure here at Elmore, I have not noticed any bad odors coming from the drains, therefore I deny this allegation. The facility is cleaned on a regular basis with cleaning materials that control odors. Occasionally, I have noticed that you can smell the materials at the Compost Area of the Recycling Plant, which is not surprising. At no time have I noticed . . . these occasional odors to be overbearing or that they cause any health problems. I deny that the Compost Area and/or the Recycling Plant handle any hazardous materials and further deny that any hazardous materials are going into the ground [or the water supply]. . . .

7. I deny that the bathrooms at ECF are inadequate. We do utilize water saving devices as a conservation and cost-saving measure. Just like at every other facility within ADOC, things break both from wear and tear and from inmate destruction. When a plumbing fixture is broken, it is repaired and/or replaced at the earliest opportunity. Water pressure in the facility is more than adequate. The bathrooms are cleaned on a regular basis and are painted as needed. I deny that the bathrooms are constantly covered with mold and mildew.

8. I would agree that ADOC, state-wide, including Elmore, has occasionally been short on correctional officers, but never to [the detriment] to the security of the facility. Correctional Officers are under administrative regulations concerning the treatment of inmates and if they violate those regulations, they receive disciplinary action.

15

9. I deny that Elmore doesn't have a 'lock-up area'. ECF has no segregation cells but does have a holding area that is utilized as a temporary lock-up area. This lock-up area is used to temporarily hold unruly inmates [so that they can be monitored more closely by correctional officers]. If an inmate needs to go to a segregation cell, he is transferred to Draper Correctional Facility or the Staton Correctional Facility, which both are in a close proximity to ECF. Inmate[s] placed in that holding area are watched closely and are given bathroom breaks as needed, food, and sleeping materials.

10. I deny that Elmore doesn't have a proper barber shop. Inmates at ECF use the barber shop within the facility. The barbering tools are sanitized [by inmate barbers utilizing appropriate sterilization materials] before use. Correctional Officers oversee the barbering services. To my knowledge and belief, ECF has not received any complaint and/or information from the contracted health care providers that the barbering at ECF has caused any health problems. . . .

11. Inmates are allowed sufficient time to eat their meals at ECF. They are not allowed to use meal time as [a] visiting and/or leisure period. I deny the claim concerning insufficient time to eat.

12. I deny that inmates are required to sign "illegal living agreements". Inmates sign a living agreement stating that they can live together without confrontation. If they cannot [and refuse to sign the living agreement], then they are separated with one being sent to a different Facility.

13. ECF inmates who work in the kitchen are provided with sufficient clean clothing. ECF inmates (all) are provided with sufficient soap to shower.

*Exh. A to the Correctional Defendants' Second Supplemental Special Report - Doc. No. 57-1* at 2-6; *Exh. B to the Correctional Defendants' Special Report - Doc. No. 6-2* at 1-3.

Although overcrowding and under staffing exists in the Alabama prison system, these facts, standing alone, are not dispositive of the issues before this court. Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough

to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). Prison conditions which may be "restrictive and even harsh, [ ] are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345-46. "'[T]he Constitution does not mandate comfortable prisons.' *Id.* at 349, 101 S.Ct. at 2400. If prison conditions are merely 'restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.' *Id.* at 347, 101 S.Ct. at 2399. Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.' *Id.*" *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). Although the Constitution "does not mandate comfortable prisons . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the conditions under which a prisoner is confined are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832  (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *Helling*, 509 U.S. at 31-32.  For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289-90 (11th Cir. 2004).   To demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry.  *Farmer*, 511 U.S. at 834.  In *Farmer*, the Court identified both objective and subjective elements necessary to establish an Eighth Amendment violation.  With respect to the requisite objective elements,  an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed].  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d 1028-29.  As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  . . . *[A]n official's failure to alleviate a significant risk that he should have perceived but did not,*

18

***while no cause for commendation, cannot under our cases be condemned as the inflection of punishment***." *Farmer*, 511 U.S. at 837-38 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is ***obduracy and wantonness, not inadvertence or error in good faith***, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

The living conditions within a correctional facility will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes*, 452 U.S. at 347. "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency. . . . But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347. To determine whether conditions of confinement

19

constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate.  *Id*. at 366.  In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards.  *Hamm v. De Kalb Cnty.*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb Cnty.*, 475 U.S. 1096 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991). The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . .  To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (emphasis in original).

A prison official may likewise be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to

take reasonable measures to abate it.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). . . .  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference."  *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference."  *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted).  As the foregoing makes clear, "[m]erely negligent failure to protect an inmate . . . does not justify liability under section 1983."  *Id*.

(i) <u>General Physical Conditions</u>.  Horsman presents conclusory allegations with respect to the structural stability of the Elmore Correctional Facility, the state of repair of the facility, the diminished size of the exercise yard, the presence of bird droppings, the emission of odors from drains and the Recycling Plaint's compost area, and peeling paint in the bathrooms.  Despite Horsman's allegations regarding the aforementioned physical conditions present at Elmore, he does not establish that the above described conditions denied him the minimal civilized measure of life's necessities or subjected them to a

wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 298-99; *Rhodes*, 452 U.S. at 347. Furthermore, Horsman fails to demonstrate deliberate indifference or reckless disregard by the named defendants with respect to his health or safety with respect to these conditions. Specifically, he does not identify any particular condition of which the defendants were aware from which an inference could be drawn that a substantial risk of serious harm existed. The record is also devoid of any evidence showing that the defendants drew the requisite inference. Consequently, summary judgment is due to be granted in favor of the correctional defendants on the plaintiff's claims attacking general physical conditions at Elmore. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-50.

(ii) Heat Exposure, Laundering of Inmate Clothing, Provision of Soap, Sleeping Guards, Living Agreements, Lack of Adequate Number of Restroom/Shower Facilities, Lack of Shower During Confinement in Lock-Up, Inadequate Meal Time, Low Water Pressure and Standing Outside Awaiting Medications. None of these conditions of confinement present a severe or extreme condition that posed an unreasonable risk of serious damage to Horsman's health and safety, and Horsman has not alleged that he suffered requisite harm as a result of periodic exposure to hot weather, the weekly laundering of his clothes, occasional lack of soap, limited access to restroom/shower facilities, short meal times, low water pressure, inattentive guards, the use of living

agreements or occasional exposure to outdoor weather conditions during pill call.  *See Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (holding that a prisoner must prove that the prison condition he complains of is sufficiently serious and "extreme" to violate the Eighth Amendment).   Accordingly, the court concludes that these alleged conditions do not rise to the level of an Eighth Amendment violation. *Alfred v. Bryant*, 378 F. App'x 977, 980 (11th Cir. 2010) ("'Inmates cannot expect the amenities, conveniences and services of a good hotel.'" (quoting *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988)).

(iii)  <u>Breaking of Rules by Other Inmates</u>.  Initially, the court finds that correctional defendants are not liable for the actions of recalcitrant inmates who chose to act in violation of institutional rules.  To the extent this assertion can be construed to allege a claim of deliberate indifference to the plaintiff's safety arising under the Eighth Amendment, the court concludes that this claim entitles Horsman to no relief.

In the evidentiary materials filed by the correctional defendants, they adamantly deny acting with either callous disregard or deliberate indifference to Horsman's safety. *Exh. A to the Correctional Defendants' Second Supplemental Special Report - Doc. No. 57-1* at 3. Specifically, Warden Daniels asserts that he, along with the correctional staff at Elmore, strive to enforce all institutional rules to prevent violations thereof by inmates. Horsman presents no evidence of an objectively substantial risk of serious harm nor is there

any evidence demonstrating an actual, subjective awareness by the defendants of a substantial risk of such harm to Horsman, each of which is a required element of this Eighth Amendment claim. Neither an assertion that the defendants should have known of potential dangers at Elmore nor the mere possibility that Horsman could be injured by other inmates during the commission of rule violations is enough to demonstrate a genuine issue regarding deliberate indifference on the part of the correctional defendants. *Brown*, 894 F.2d 1537. "Plaintiff has failed to establish that the Defendant[s] had a subjective awareness of a substantial risk of serious physical [harm] to Plaintiff; thus, Plaintiff has failed to establish a required element of this claim. When viewing the evidence most favorably toward Plaintiff, a claim for deliberate indifference has not been established . . . ." *Carter*, 352 F.3d at 1350 (footnote omitted). Thus, summary judgment is due to be granted in favor of the defendants on this claim.

(iv) <u>Dumping of Hazardous Materials, Ground Contamination and Mold in the Bathrooms</u>. Horsman alleges that "hazardous substances are being poured out on the ground" in the area of the Recycling Plant and asserts that "soil samples should be taken" to determine whether health hazards exist at Elmore. *Complaint - Doc. No. 1-6* at 7. Horsman further alleges that mold is a "common sight[]" in the bathrooms. *Id.* Other than his self-serving conclusory allegations, Horsman presents no evidence to support these claims. The correctional defendants "deny that the Compost Area and/or Recycling Plant

handle any hazardous materials and [therefore] deny that any hazardous materials are going into the ground [or the water supply]." *Exh. A to the Correctional Defendants' Second Supplemental Special Report - Doc. No. 57-1* at 4. The defendants further deny that mold is a constant presence in the bathrooms and assert that the bathrooms are "cleaned on a regular basis." *Id*. at 7.

Horsman fails to meet his burden at the summary judgement stage as he does not establish that the allegations regarding hazardous materials and mold resulted in a denial of the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 297; *Rhodes*, 452 U.S. at 347. Specifically, Horsman's mere subjective beliefs and conclusory allegations regarding these conditions do not create a genuine dispute of material and, as such, "are insufficient to withstand summary judgment." *Holifield*, 115 F.3d at 1564 n.6. Hence, summary judgment is due to be granted in favor of the defendants.

(v) Conditions of Lock-Up. Horsman maintains that in June of 2011, Warden Daniels ordered his placement in "lock-up" because he received payment from a free world individual "for allegedly helping someone with a legal matter" - an action violative of institutional rules. *Amendment to the Complaint - Doc. No. 34* at 4. Horsman asserts that the lock-up cell at Elmore is not an appropriate area in which to house inmates suspected of rule violations. *Complaint - Doc. No 1-6* at 8. In support of this claim, Horsman

maintains that the lock-up room utilized at Elmore is not equipped with a sink or toilet thereby requiring that inmates be escorted by correctional officers to the bathroom and, therefore, he sometimes had to wait to use the restroom. *Id*. Horsman further complains that this room lacks chairs or a bed on which an inmate may sit and he was only provided a cot on which to sleep. *Id*. Horsman states that he was housed in this area for three days and during this time he did not shower, brush his teeth or have his asthma medication in his possession. *Amendment to the Complaint - Doc. No. 34* at 3-4. Horsman also alleges that during his time assigned to lock-up he spent the majority of each day outdoors in a small fenced area.

In response to these allegations, Warden Daniels asserts that although there are no segregation cells at Elmore the facility does have a holding area that is utilized "to temporarily hold unruly inmates." *Exh. A to the Correctional Defendants' Second Supplemental Special Report - Doc. No. 57-1* at 5. While on lock-up status, inmates are closely monitored "and are given bathroom breaks as needed, food, and sleeping materials." *Id*. In addition, "[w]hen the temperature rises, inmates are given access to additional water and ice" and they are not exposed to direct sunlight for long periods of time. *Id*. at 2-3. Despite the lack of a sink and toilet in the holding area, Horsman concedes he had access to restroom facilities, food, water, a cot and bed linens. Horsman does not allege that he advised Warden Daniels or any other named defendant of his lack

26

of asthma medication for the limited period of time he was confined in the lock-up room. Moreover, Daniels indicates that he had no knowledge of Horsman's lack of access to asthma medication during his temporary confinement in the holding area.

As to the conditions of the holding area and confinement outside the facility, the court finds that these claims provide no basis for relief.  It is undisputed that during the 3-day period of time during which Horsman was assigned to lock-up he had access to restroom facilities, including running water, was provided meals, received sleeping materials and, while outside, received ice and water.  Although he did not have a chair or framed bed on which to sit in the holding room, he could sit on the floor or, when available, the sleeping materials provided to him.  *Cf. Alfred*, 378 F. App'x at 980 ("Objectively speaking, sleeping on a steel bed without a mattress for eighteen days, though uncomfortable, is not so extreme as to violate" the Eighth Amendment.).  Finally, the mere confinement of an inmate in an outdoor area, in and of itself, is not so extreme that it constitutes a violation of the Constitution.  *See Wilson*, 501 U.S. at 298-99.

The Constitution does not mandate that prisons be comfortable, *Rhodes*, 452 U.S. at 349, and "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004).  Horsman has failed to establish that the conditions relative to his time in the holding area denied him the minimal civilized measure of life's necessities or subjected him to a wanton and

unnecessary infliction of pain. *Wilson*, 501 U.S. at 298-99; *Rhodes*, 452 U.S. at 347. Consequently, the court concludes that the conditions associated with Horsman's limited stay in lock-up did not constitute cruel and unusual punishment in violation of the Eighth Amendment.

With respect Horsman's allegation that he did not have possession of his asthma medication while in the holding area, the court finds that Horsman fails to present sufficient evidence to create a genuine issue of disputed fact with respect to his claim that Warden Daniels or any other named defendant acted with deliberate indifference to his medical needs during his 3-day confinement in the lock-up area. Specifically, the record does not indicate that the named defendants had knowledge of specific facts from which an inference could be drawn that a substantial risk of harm existed to Horsman, that these defendants actually drew this inference and thereafter ignored the risk. Horsman has therefore failed to establish each of the requisite elements of his deliberate indifference claim regarding a lack of medication while temporarily confined in the lock-up area. *Carter*, 352 F.3d at 1350. Thus, summary judgment is due to be granted in favor of the defendants.

(vi) <u>Inadequate Barber Shop</u>. Horsman challenges the limited size of the barber shop at Elmore and the sanitation procedures utilized by the inmate barbers. The correctional defendants deny that the on-site barber shop is insufficient to meet the

demands of inmates and assert that "[t]he barbering tools are sanitized before" use on an inmate. *Exh. A to the Correctional Defendants' Second Supplemental Special Report - Doc. No. 57-1* at 5. Initially, it is clear that the size of the barber shop does not present a severe or extreme condition which poses an unreasonable risk of serious harm to Horsman's health or safety. *Chandler*, 379 F.3d at 1289. It is likewise clear that the dimensions of the barber shop did not deprive Horsman "of the minimal civilized measure of life's necessities" so as to violate the Eighth Amendment. Therefore, the challenge to the size of the barber shop does not rise to the level of a constitutional violation.

Horsman makes the conclusory and unsupported allegations that "due to unclean barber tools" he suffered a "staph infection" causing sores on his head. *Amendment to the Complaint - Doc. No. 34* at 6. Horsman acknowledges that he self-medicated these head sores "which took several months to [heal]." *Id.* A review of the undisputed medical records likewise establishes that Horsman did not seek medical treatment for these sores. Consequently, there is no medical diagnosis to support Horsman's assertion that the head sores resulted from a staph infection. Other than his self-serving, conclusory and unsupported allegation, Horsman presents no evidence supporting his claim that the barbering procedures caused his head sores. Moreover, the evidentiary materials submitted by the medical defendants indicate that health care personnel were not aware of any medical issue arising from the tools used by inmate barbers. It is likewise clear that

29

Horsman's condition could have occurred due to a number of other reasons and been caused by something other than a staph infection.

In reference to these claims, Warden Daniels advises that inmate barbers sanitize their barbering tools utilizing appropriate sterilization procedures and materials before use. "Correctional Officers oversee the barbering services. To my knowledge and belief, ECF has not received any complaint and/or information from the contracted health care providers that the barbering at ECF has cause any health problems . . . ." *Exh. A to the Correctional Defendants' Second Supplemental Special Report - Doc. No. 57-1* at 5.

Horsman does not allege that any named defendant participated in the barbering services provided to him. The law is well settled

> that Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior* [or vicarious liability]. . . . *Robertson v. Sichel*, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ('A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties'). Because vicarious liability is inapplicable to ... §1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no

respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability for haircuts provided to Horsman could attach to the named defendants only if they "personally participated" in the challenged conduct or  a "causal connection" exists between their actions and the alleged deprivation of Horsman's constitutional rights. *Cottone*, 326 F.3d at 1360. Horsman, however, has presented no evidence, nor can the court countenance the existence of any evidence, which would create a genuine issue of disputed fact with respect to the claim of deliberate indifference by the correctional defendants as to the barbering procedures. The record is devoid of evidence indicating that these defendants personally participated in or had any involvement, direct or otherwise, with haircuts provided to Horsman.

In light of the foregoing, Warden Daniels and the other correctional defendants can be held liable for behavior of other correctional personnel only if their actions bear a causal

relationship to the purported violation of Horsman's constitutional rights.  To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Horsman must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's barbering staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so."  *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Horsman has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the named defendants directed the inmate barbers or correctional personnel assigned to the barber shop to act unlawfully or knew that they would act/acted unlawfully and failed to stop such action.  In addition, Horsman has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which the defendants failed to take corrective action.  Finally, it is undisputed that the actions about which Horsman complains did not occur pursuant to a policy enacted by the defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy

standard is not warranted.  *Cf. Empl't Div. v. Smith,* 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987).  Summary judgment is therefore due to be granted in favor of the correctional defendants on this claim.

(vii)  <u>Kitchen and Dietary Issues</u>.  Horsman complains that "[t]he kitchen area has drainage problems" which causes "standing water many places within the kitchen. . . . Cleaning chemicals are stored in areas where food is and the odor of bleach . . . makes the eyes of inmates working in these areas burn and turn red.  Inmates handle food without washing their hands or without wearing plastic gloves.  The kitchen is surprisingly clean, but there are many health code violations that need correcting." *Complaint - Doc. No. 1-6* at 10.[7]  Horsman also alleges that meal portions have diminished, extra food is thrown in the trash, dietary sandwiches are not properly served to inmates, food items are not properly stored, there is cross-contamination of food and the kitchen lacks adequate spoons and trays to maintain efficient service.  *Id*.

Defendant Hooks addresses these claims as follows:

1.  The Plaintiff alleges that at most times there are stopped-up drains and standing water in the Kitchen at the Elmore Correctional Facility (ECF).  This is untrue.  The kitchen is cleaned on a regular basis.  All cleaning materials and water [either go] out the drain or [are] mopped up.  Water is not allowed to stand on the kitchen floor.

2.  The cleaning materials for the kitchen . . . are stored separately [from the food].  Bleach is one of the cleaners used to clean the kitchen and to kill

---

[7]Horsman does not identify the "other" purported health code violations.

bacteria. [Occasionally there is an order of bleach because of the use of a bleach-based solution to kill bacteria and germs.]  Inmate workers utilized in the kitchen are required to was their hands and wear plastic gloves.  The kitchen at ECF is randomly inspected by the County Health Department and by the ADOC Office of Health Services Environmental Supervisor.  Any violations noted are corrected as soon as reasonably possible.  The kitchen at ECF has sufficient silverware and food trays to feed the inmate population. The ADOC menu is set by the ADOC Dietician in accordance [with] dietary guidelines.  Inmate workers are provided clean clothes to work in the kitchen.  The food in the ECF kitchen is stored properly, in coolers and otherwise.  There is no 'cross-contamination' of food.

3.  Leftover food is destroyed for sanitary and security reasons.  Dietary sandwiches are wrapped in sanitary wrapping and are not slid "across a dirty counter".  Just as stated above, the kitchen is cleaned on a regular basis, including all counters.

4.  Although security in the dining area is not my responsibility, I have observed that inmate[s] are allowed sufficient time to eat.

5.  I deny that I have in any way violated the constitutional rights of Inmate Horsman.

*Exh. C to the Correctional Defendants' Second Supplemental Special Report - Doc. No. 57-3* at 1-3; *Exh. E to the Correctional Defendants' Special Report - Doc. No. 6-5* at 1-2.

Despite his contentions regarding the conditions of the kitchen, Horsman has failed to establish that these conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain.  *Wilson*, 501 U.S. at 298-99; *Rhodes*, 452 U.S. at 347.  Furthermore, Horsman has failed to demonstrate any deliberate indifference or reckless disregard by the named defendants with respect to his health or safety.  Specifically, Horsman has failed to identify any particular incident or

condition occurring in the kitchen from which the defendants could infer that a substantial risk of serious harm existed to him.  Consequently, summary judgment is due to be granted in favor of the correctional defendants on these claims.  *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-50.

(viii)  <u>Totality of Conditions</u>.  The court has undertaken a thorough and exhaustive review of the claims presented by Horsman, the responses to these claims by the defendants and the probative evidentiary materials submitted by the defendants.  After such review, the court finds that the challenged conditions though uncomfortable, inconvenient, unpleasant and/or objectionable were not so extreme as to violate the Eighth Amendment. *Chandler v. Baird*, 926 F.2d at 1289 (11th Cir. 1991).  Specifically, the totality of the claims before this court do not amount to conditions which fall below applicable constitutional standards as Horsman failed to demonstrate that the challenged conditions had "a mutually enforcing effect that produce[d] the deprivation of a single, identifiable human need." *Wilson*, 501 U.S. at 304.  "To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id*.

35

2.  Claims Regarding Medical Treatment

Due to the completely conlcusory nature of Horsman's original allegation of "deficiencies in both medical and mental health care" provided to inmates at Elmore, *Complaint - Doc. No. 1-6* at 11, the court required that Horsman file an amendment to his complaint which "specifically describes how the defendants have denied him adequate mental health and/or medical treatment[.]" *Order of November 17, 2014 - Doc. No. 26* at 1.  In response to this order, Horsman advised that he "has no specific complaints against the health care defendants except to confirm that he has had to stay outside in bad weather to pick up his K.O.P. medicine and that he's witnessed others not being given their medicine or given the wrong medicine.  Many times K.O.P. medicine is not reordered and an inmate has to wait days and sometimes weeks to get his medicine again.  This has happened to Horsman and to other inmates at Elmore.  Also, there is no health care personnel on duty at Elmore for emergency treatment if needed." *Amendment to the Complaint - Doc. No. 34* at 3.

As previously determined, Horsman lacks standing to present claims on behalf of other inmates. *Supra* at 11-14.  Thus, those claims addressing medical treatment provided to other inmates entitle Horsman to no relief.  With respect to the remaining medical treatment claims, Michele Sagers-Copeland, a registered nurse who serves as the Health Services Administrator at Staton Correctional Facility, addresses these claims as follows:

As part of my duties and responsibilities as the HSA at Staton, I also oversee the medical services provided to the inmates incarcerated at Elmore Correctional Facility ("Elmore"), which is located approximately a quarter of a mile from Staton.  Because of the close proximity of Elmore and Staton, the medical staff at Staton also oversees and ensures the delivery of medical care to the inmates at Elmore as well.

* * *

A true and correct copy of [Horsman's] medical records are . . . attached hereto.  . . .

Upon arriving at any facility operated by the ADOC, inmates are notified of the procedures and processes for obtaining medical care and prescribed medications.  The health care units within ADOC facilities generally rely upon the same procedures for obtaining emergency and non-emergency (i.e., sick call) medical treatment, conducting chronic care clinics, medication administration, segregation sick call and the like and permitting an inmate's invocation of and participation in a grievance process.  As part of this medical staff's orientation of inmates, inmates are provided a form entitled "ACCESS TO HEALTHCARE SERVICES" which also provides a detailed explanation of the grievance process.  Signed Access to Care forms are included in [Horsman's] medical records acknowledging [his] understanding of these processes and procedures.

As part of the orientation process, inmates are instructed that, in the event that they experience a non-emergency medical condition or complaint, they should utilize the process known as "sick call," which is initiated through the completion of a sick call request form.  An inmate making a sick call request is required to complete the top portion of the sick call request form (stating his name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and his signature).  The inmate then submits the sick call request form [to medical personnel] by placing it in the locked box located outside the shift office.  The sick call request forms are removed from the locked box each day at approximately 12:00 p.m., brought to the Health Care Unit and marked as received [by medical personnel] at that time.

Upon reviewing the sick call request forms, the medical staff compiles a list of inmates that have submitted sick call request forms and provides the list to the Alabama Department of Corrections officer assigned to the Health Care Unit.  The Health Care Unit officer summons the patients by radio.  [Inmates at Elmore on the sick call list are transported to the Health Care

Unit at Staton for evaluation and treatment.] . . .

A submitted sick call request form that is not [subsequently] completed by the medical staff indicates that an inmate failed to report when summoned to sick call. A refusal must also be completed; signed by the sick call nurse and a witness (medical staff) and placed in the inmate['s] file. If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the Health Care Unit for medical treatment, and the inmate will not be required to wait until sick call begins. As evident through[out] the records of [Horsman, he has] relied upon and regularly utilized this sick call process to receive medical attention.

Inmates with chronic medical conditions at Elmore are also eligible to attend regularly scheduled evaluations called "chronic care clinics." Chronic care clinics are held on approximately a quarterly basis for inmates diagnosed with a chronic medical condition such as hypertension, diabetes, hepatitis C, and chronic obstructive pulmonary disease. Inmates are not charged any type of co-pay in order to attend a chronic care clinic. These chronic care clinics are particularly important for inmates prescribed certain types of medications or treatments that require regular monitoring, such as diabetics receiving insulin on a sliding scale. Mr. Horsman . . . participated in chronic care clinics conducted for the inmates at Elmore.

As set forth in the "ACCESS TO HEALTHCARE SERVICES" form, inmates at Elmore also receive prescribed medication through the process commonly referred to as "pill call." During pill call, inmates line up outside the pill call windows outside the pill call room at Elmore. When the inmate arrives at the pill call window, he provides a member of the medical staff [conducting pill call] with his identification badge which is issued by the ADOC. The member of the medical staff then retrieves the inmate's medication which is organized alphabetically and punches the medication out of a medication blister pack into a small plastic cup. The medication is provided to the inmate who is required to immediately take the medication.

As the pill call process progresses, the medical staff conducting pill call records the disbursement of medication on forms known as "Medication Administration Records" or MARs. These MARs are maintained and filed in the individual inmate['s] medical records. Once the medications are dispensed, the medical staff member records the dispensing of medication by placing his initial or initials in the space provided on the corresponding MAR. If an inmate does not report to pill call to retrieve his medication, the

medical staff member will [place a notation of "A" or "a" in the MAR] indicating the inmate was "absent." If the medical staff conducting pill call discovers an inmate's medication has run out, expired or cannot otherwise be dispensed to the inmate, the medical staff at Elmore is instructed to document the unavailability of the medication and notify their supervisor or the prescribing physician immediately. The . . . medical records reflect [Horsman's] receipt of medication through the pill call process. In the event that any inmate is not compliant with his medications, then the medical staff will confirm in writing a counseling session with the inmate in which the medical staff informs the inmate as to the importance of appearing for pill call to receive his medication.

In addition to the pill call process, some inmates at Elmore are permitted to maintain their prescription medication on their person and administer this medication without oversight from the medical staff. This process is known as "Keep on Person" or "KOP" medication administration which is more efficient and sometimes [a] more effective medication administration process. Certain medications for certain conditions cannot be administered through the KOP program, such as narcotics and certain psychotropic medications. When an inmate is enrolled in KOP medication administration, he or she is required to consent to such enrollment and is notified of the specifics of the process itself. Inmates enrolled in the KOP program are given blister packs containing their medication. These blister packs of medication provide explicit directions as to the order in which the medications should be taken. . . . In short, inmates enrolled in the KOP program are personally responsible for taking their medication as prescribed. However, these inmates enrolled in the KOP program are not required to receive medication through pill call. Specifically, Mr. Horsman . . . [has] received certain medications by virtue of this KOP protocol.

. . . [I]nmates at Elmore are well-aware of and utilize the grievance process to voice a complaint regarding any medical treatment sought or received during their incarceration at Elmore. The initial orientation process . . . includes educating inmates as to the availability of the grievance process. . . .

The grievance process is initiated when an inmate submits a Medical Grievance form to me. . . . After reviewing the Medical Grievance, I then provide a written response within approximately ten (10) days of receipt of the Inmate Grievance. The written response to a Medical Grievance is included on the bottom portion of the same form containing an inmate's

Medical Grievance.  Below the portion of the form designated for the "Response," the following notation appears:

> IF YOU WISH TO APPEAL THIS REVIEW YOU MAY REQUEST A <u>GRIEVANCE APPEAL</u> FORM FROM THE HEALTH SERVICES ADMINISTRATOR.  RETURN THE COMPLETED FORM TO THE ATTENTION OF THE HEALTH SERVICE ADMINISTRATOR. YOU MAY PLACE THE FORM IN THE SICK CALL REQUEST BOX OR GIVE IT TO THE SEGREGATION SICK CALL NURSE ON ROUNDS.

As stated in the Medical Grievance forms, the second step of the grievance process involves the submission of a formal Medical Grievance Appeal, at which time the inmate may be brought in for one-on-one communication with the medical staff, myself and/or the Director of Nursing.  A written response to a formal Medical Grievance Appeal is provided within approximately ten (10) days of receipt.  Medical Grievance and Medical Grievance Appeal forms are available from the Health Care Unit and the correctional shift commander office at Staton.  Inmates are instructed to place completed Medical Grievance and Medical Grievance Appeal forms in the sick call boxes located outside the shift office. [Members of] [t]he medical staff at Staton review[] the grievances daily, provide a written response within approximately ten (10) days at the bottom of the form and return a copy of the completed forms [to an authorized correctional officer] who distributes them to the inmates.  Inmates who have complaints about the medical care they have sought or received at Elmore are encouraged to utilize this grievance process.

While [Horsman] filed Medical Grievances [regarding the need for a chronic care appointment and an issue with his KOP medication on June 26, 2009 and July 5, 2009, respectively, he] did not file any Medical Grievance Appeal in response to the response[s] [he] received to [either of these] Medical Grievance[s]. [Horsman filed no other Medical Grievances with respect to any issues regarding medical treatment.]
* * *

Contrary to the allegations in the Complaint, I am not aware of any instance with the medical staff at Staton provid[ing] the wrong or incorrect medication to [Horsman].  The suggestion that Staton medical staff provided

any inmate with the wrong medication because nurses "cannot even read very well" is simply false. These nurses are licensed by the State of Alabama. If the nurses on staff at Staton could not "read very well," they would not have passed the written examinations and course study required to obtain their licenses to practice nursing at various levels.

[Horsman] also complains that "pain management" or pain medication is not available to the inmate population. This is simply untrue. Physicians along with other clinicians at Elmore have prescribed narcotic medications to patients who require such medications because of their underlying medical conditions. The physicians to a prison population are routinely requested to provide inmates with a certain level of pain medication beyond over-the-counter medications. In some instances, it has been abundantly clear that some inmates voicing these requests were simply undertaking unjustified drug seek[ing] activities. In other instances, it has been determined that the request was well-founded and inmates are provided with pain medication. However, I am unaware of any inmate being denied any necessary pain medication when it was warranted by the facts presented upon [a] physician's medical judgment.

The suggestion in the Complaint that the medical staff at Staton is not properly monitoring infection control at Elmore is simply incorrect. The medical staff at Staton relies on a variety of infection control and prevention practices which are intended to prevent widespread outbreaks of infectious diseases among the inmate populations at both Staton and Elmore. For example, the medical staff at Staton maintains an infectious control nurse who is responsible for overseeing any inmate who experiences a suspicious boil or ulcer or is otherwise diagnosed with MRSA or some other similar infectious disease. Once an inmate is diagnosed with any sort of potential skin infection, he or she is required to undergo evaluation by a physician as well as an examination by the infectious control nurse until the infection is resolved.

The medical staff routinely educates Elmore inmates of proper hygiene practices to prevent the widespread outbreak of infectious diseases. The medical staff also relies upon routine vaccinations for the inmate population as an additional means of infection control. The medical staff also completes documentation for food service workers at Elmore to ensure that no inmate with infectious diseases are permitted to serve food to other inmates.

The [Complaint] specifically mention[s] alleged violations of

41

"[t]uberculosis detection and control procedures.["]   However, I am not aware of any instance when the policies and/or procedures adopted by Corizon, Inc. relative to tuberculosis have been violated in any way.  As a general matter, inmates undergo tuberculosis testing upon their initial intake into the state correctional system at Kilby.  After an inmate's arrival at Elmore, the medical staff will monitor for tuberculosis in many ways.  First, in the event any inmate reports symptoms which are reasonably indicative of tuberculosis, the medical staff will test the inmate for tuberculosis and will likely order a chest x-ray.  In the event that the chest x-ray is indicative of a possible tuberculosis infection, then the medical staff may isolate the inmate from the general population.  Even if an inmate does not report symptoms of tuberculosis, the medical staff also monitors for tuberculosis through the annual physical process.  Inmates are also allowed to refuse their annual physical examinations; however, they are not allowed to refuse an annual tuberculosis test.  This process is even reflected in Mr. Horsman's medical records.  Mr. Horsman received a full annual physical on January 22, 2009, including a TB skin test.  However, Mr. Horsman refused his annual health evaluation on November 16, 2010, but was required to submit to a TB skin test. . . . [Horsman did not test positive for tuberculosis.]
* * *

In the event that any inmate at Elmore tests positive for "active" tuberculosis, he would be transported immediately to Kilby for isolation. Most importantly, I am not aware of any significant incidents or outbreaks of any infectious diseases at Elmore [during the relevant time period] or any other information which would support [Horsman's] allegations relative to infectious diseases at Elmore.

In the event that an inmate housed at Elmore experiences any type of urgent or emergency medical condition, such an inmate would be immediately brought . . . down the road to Staton (approximately one quarter mile) for immediate evaluation.  In the event that the inmate requires some type of hospital or special care, an ambulance would be summoned to Staton for transfer of the inmate.  I am not aware of any instance when any inmate has suffered any medical emergency and not received appropriate or timely medical attention for his complaints and/or medical condition. Moreover, the suggestion in the Complaint that inmates have died as a result of any delay in emergency medical services is simply false.  I cannot identify one instance when an inmate at Elmore experienced any unnecessary delay in receiving emergency medical treatment because of this process.

*Exh. 1 to the Medical Defendants' Special Report - Doc. No. 7-1* at 2-11 (citations to medial records and paragraph numbering omitted). Nurse Sagers-Copeland filed a supplemental affidavit in which she addresses the assertions set forth by Horsman in the amendment. The relevant portion of this affidavit reads as follows:

> With respect to Mr. Horsman's complaints about K.O.P. medications, it is clear from his medical records that Mr. Horsman has received medications pursuant to the Keep-on-person or "KOP" program which is available to inmates at Elmore Correctional Facility ("Elmore"). The KOP program was [previously] discussed in detail. . . . [A]n inmate enrolled in the KOP program such as Mr. Horsman is tasked with the responsibility of notifying members of the medical staff when his medication requires re-ordering [to ensure the medication is in stock when his allotment is depleted]. Specifically, we encourage inmates to notify the medical staff when they have approximately five (5) to seven (7) days of remaining medication so that we have sufficient time to re-order and receive his medication. Mr. Horsman signed the KOP protocol form dated July 15, 2011, in which he clearly acknowledged, "**I am to bring the package to the health care unit when it gets down to seven days of pills in my individual packs so the nursing staff can reorder my medications . . . .**" In addition to the responsibility assumed by inmates to request a refill of their medications, the medical staff has employed a "tickler" system for medications for chronic conditions which are taken at regular intervals. For example, if a patient receives a pre-determined dosage of medication through the KOP protocol, he will receive a sufficient amount of medication for thirty (30) days and a refill is automatically ordered for him prior to the expiration of the 30-day period. However, this is true for only specific categories of medications and does not apply to inhalers or medication taken on a "prn" or as needed basis [such as the inhalers and medications prescribed to Horsman]. Mr. Horsman's medical records also reflect timely and consistent orders from the site physician renewing his prescriptions for medications. On the occasions Mr. Horsman was evaluated during the chronic care clinics, he did not notify members of the medical staff of any problems receiving his KOP medications. [In] June of 2011, Mr. Horsman reported to the medical staff that he was, in fact, "doing well."

If any significant delay occurred in Mr. Horsman receiving his medication, such a delay is the result of Mr. Horsman not notifying the medical staff on a timely basis of his need for a refill of his medications, especially the inhalers and "prn" medications which he has utilized during his incarceration at Elmore.  Mr. Horsman's records do not indicate any such delay in the provision of medication.  For example, Mr. Horsman received a QVAR inhaler on March 27, 2011, which should have lasted at least 30 days.  Mr. Horsman received another inhaler on April 24, 2011.  In fact, I cannot identify any occasion in Mr. Horsman's records when he experienced any significant or serious delay in receiving any medications.  Not only has the medical staff ensured that Mr. Horsman received his medication, a member of the medical staff actually provided counseling to Mr. Horsman in April of 2009 because he had missed 11 consecutive days of his medication. [With respect to the claims timely presented in this cause of action,] Mr. Horsman did not file any sick call request form notifying the medical staff that he was not receiving refills for his KOP medications on a timely basis.  However, he did request to receive certain medication via the KOP protocols.  Finally, there is nothing in Mr. Horsman's medical records indicating that he ever reported any "injury" or harm resulting from not receiving any medication in a timely fashion.

Prior to the filing of this action by Mr. Horsman, Mr. Horsman filed two Medical Grievances pursuant to the long-standing grievance process. . . . Mr. Horsman never filed a Medical Grievance Appeal after receiving the responses to these Medical Grievances. [Horsman submitted the first Medical Grievance on June 26, 2009 in which he questioned a missed appointment with the chronic care clinic.  Medical personnel responded to this grievance on June 30, 2009 advising Horsman that he had a pending chronic care appointment.  Horsman did not appeal the response provided to this grievance.]  In a Medical Grievance dated July 5, 2009, . . . Mr. Horsman complained that he was not receiving his "K.O.P. for [his] asthma."  After being instructed to check at the pill call window for his new medication refills, Mr. Horsman did not file a Medical Grievance Appeal.[8]  Additionally, I cannot find any other complaint from Mr. Horsman regarding his KOP medication since July of 2009.

While Mr. Horsman complains about the availability of emergency

---

[8]Each of these grievances addressed medical claims arising more than two years prior to the filing of the instant complaint - claims which would be barred by the two-year period of limitations applicable to § 1983 actions.

medical services to inmates at Elmore, I cannot find any documentation indicating that Mr. Horsman ever experienced any medical emergency at Elmore.  Also, the Alabama Department of Corrections and the Staton medical staff have adopted and enacted specific practices and procedures in the event that an inmate at Elmore experiences a medial emergency.  For example, if an inmate at Elmore experiences a medical emergency, the Staton medical staff is less than a mile [from Elmore].  Moreover, if a medical emergency occurs at Elmore which requires transportation to a local hospital, the time frame within which an inmate is transported [for emergency treatment] does not differ in any meaningful respect . . . whether the inmate is housed at Staton or Elmore.  Therefore, I cannot identify any basis for any concern on the part of Mr. Horsman regarding the availability of emergency medical services at Elmore.

. . .  I am not aware of any additional medical treatment of any kind that should have been provided to Mr. Horsman.  I have not denied and am not aware of any other member of the medical staff at Staton who denied Mr. Horsman any necessary medical treatment or ignored any of his complaints.

*Exh. 1 to the Medical Defendants' Supplemental Special Report - Doc. No. 55-1* at 2-5

(citations to medial records and paragraph numbering omitted) (emphasis in original)

(footnote added).  The information set forth by Nurse Sagers-Copeland in her affidavits is

supported by the records compiled contemporaneously with the medical treatment provided

to Horsman.

The defendants deny Horsman's allegations challenging the adequacy of medical

treatment he received while at Elmore and likewise maintain that these claims are subject

to dismissal because Horsman failed to exhaust the administrative remedy provided via the

medical care provider prior to filing this complaint as required by the Prison Litigation

Reform Act, 42 U.S.C. § 1997e(a).

> When deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts, and if they conflict, take the plaintiff's version of the facts as true. 'If in that light, the defendant[s] [are] entitled to have the [unexhausted claims] dismissed for failure to exhaust administrative remedies, [the claims] must be dismissed.' *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir.2008) (citing *Bryant* [*v. Rich*, 530 F.3d 1368, 1373-74 (11th Cir. 2008)]).   If the complaint is not subject to dismissal at this step, then the court should make 'specific findings in order to resolve the disputed factual issues related to exhaustion.' *Id.* (citing *Bryant*, 530 F.3d at 1373-74, 1376).

*Myles v. Miami-Dade Cnty. Corr. and Rehab. Dep't*, 476 F. App'x 364, 366 (11th Cir. 2012).

(i)  Exhaustion of Administrative Remedies.  The Prison Litigation Reform Act compels exhaustion of available administrative remedies before a prisoner can seek relief in federal court on a § 1983 complaint.  Specifically, 42 U.S.C. § 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  "Congress has provided in § 1997(e)(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies."  *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Exhaustion of all available administrative remedies is a precondition to litigation and a

46

federal court cannot waive the exhaustion requirement. *Booth*, 532 U.S. at 741; *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998); *Woodford v. Ngo*, 548 U.S. 81 (2006). Moreover, "the PLRA exhaustion requirement requires ***proper exhaustion***." *Id.* at 93 (emphasis added). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings. . . . Construing § 1997e(a) to require proper exhaustion . . . fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage." 548 U.S. at 90-91, 93. The Court reasoned that because proper exhaustion of administrative remedies is necessary an inmate cannot "satisfy the Prison Litigation Reform Act's exhaustion requirement . . . by filing an untimely or otherwise procedurally defective administrative grievance or appeal[,]" or by effectively bypassing the administrative process simply by waiting until the grievance procedure is no longer available to him. *Id.*; *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA). "The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he

filed his original complaint." *Smith v. Terry*, 491 F. App'x 81, 83 (11th Cir. 2012) (per curiam). Even where an inmate litigant "attempt[s] to amend or supplement his original complaint" regarding efforts at subsequent exhaustion, it does "not change the important historical fact: his administrative remedies were unexhausted when he filed his original complaint. Therefore, he cannot cure the exhaustion defect." *Id*.

The record in this case is undisputed that the health care provider for the Alabama Department of Corrections provides a grievance procedure for inmate complaints related to the provision of medical treatment. The evidentiary materials submitted by the medical defendants further demonstrate that Horsman failed to file a requisite grievance challenging the medical claims presented in this federal civil action which are filed within the applicable two-year period of limitations, i.e., actions which occurred on or after July 11, 2009.[9] Moreover, with respect to the grievances filed by Horsman on June 26, 2009 and July 5, 2009, Horsman did not appeal the responses to these grievances.

---

[9]Horsman verified completion of the complaint on July 12, 2011, *Complaint - Doc. No. 1-6* at 16, and this date constitutes the earliest date on which Horsman could have submitted the complaint to prison officials for mailing. The law is well settled that a *pro se* inmate's complaint is deemed filed the date it is delivered to prison officials for mailing. *Houston v. Lack*, 487 U.S. 266, 271-72 (1988); *Adams v. United States*, 173 F.3d 1339, 1340-41 (11th Cir. 1999); *Garvey v. Vaughn*, 993 F.2d 776, 780 (11th Cir. 1993). "Absent evidence to the contrary in the form of prison logs or other records, [this court] must assume that [the instant complaint] was delivered to prison authorities the day [Horsman] signed it . . . ." *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001). Thus, for purposes of this Recommendation, the court considers July 12, 2011 as the date of filing. "All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought. *Wilson v. Garcia*, 471 U.S. 261, 275-76, 105 S. Ct. 1938, 1946-47, 85 L. Ed. 2d 254 (1985). [The plaintiff's] claim was brought in Alabama where the governing limitations period is two years. Ala. Code § 6-2-38; *Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989) (en banc). Therefore, in order to have his claim heard, [the plaintiff is] required to bring it within two years from the date the limitations period began to run." *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008).

Horsman does not dispute his failure to exhaust the administrative remedy available to him for medical claims prior to filing this case which is a precondition to proceeding before this court on such claims. *Ngo*, 548 U.S. at 87-94. Horsman has presented no circumstances which justify his failure to exhaust the grievance procedure provided by the medical care provider. Under these circumstances, the court finds that the medical treatment claims presented in this cause of action are subject to dismissal for Horsman's failure to exhaust an administrative remedy, *Id.*, and that dismissal with prejudice as to the exhaustion defense is appropriate. *Bryant*, 530 F.3d at 1375 n.1 (acknowledging that where administrative remedies are clearly time barred or otherwise infeasible inmate's failure to exhaust may "correctly result in a dismissal with prejudice."); *Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995) ("Without the prospect of a dismissal with prejudice, a prisoner could evade the exhaustion requirement by filing no administrative grievance or by intentionally filing an untimely one, thereby foreclosing administrative remedies and gaining access to a federal forum without exhausting administrative remedies."); *Johnson*, 418 F.3d at 1157 (same); *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004) (footnotes omitted) (indicating inmate's "federal lawsuits ... properly dismissed with prejudice" where previously available "administrative remedies have become unavailable after prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust.").

Even had Horsman exhausted his administrative remedies with respect to his

49

medical treatment claims, the court finds that Horsman is nonetheless entitled to no relief as he has failed to establish deliberate indifference by either the correctional or medical defendants.

(ii) <u>Correctional Defendants</u>.  The claims made against the correctional defendants challenging the constitutionality of treatment provided by medical professionals entitles Horsman to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g.*, *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.*, 198 Fed. Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007).

To the extent Horsman seeks relief from the correctional defendants for the treatment furnished to him by medical personnel, assuming *arguendo* the aforementioned defendants exerted some authority over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled, as

discussed above, "that Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior* [or vicarious liability]. *Iqbal*, 556 U.S. at 676. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677. Thus, liability for medical treatment provided to Horsman could attach to the correctional defendants only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Horsman, however, has presented no evidence and the court cannot envision the existence of any evidence which would create a genuine issue of disputed fact with respect to deliberate indifference by the correctional defendants. The record is devoid of evidence indicating that these defendants personally participated in or had any involvement, direct or otherwise, with the medical treatment provided to Horsman; rather, it is undisputed that correctional officials did not participate in the provision of treatment to Horsman. The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the courses of treatment provided to Horsman and that they provided treatment to Horsman in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, defendants Bentley, Thomas, Daniels, McKee, Clemons,

Hooks, Jamison and Lynam can be held liable for decisions of medical personnel only if their actions bear a causal relationship to the purported violation of Horsman's constitutional rights.  To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the aforementioned defendants, Horsman must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Horsman has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the correctional defendants directed medical personnel to act unlawfully or knew that they would act/acted unlawfully and failed to stop such action.  In addition, Horsman has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which these defendants failed to take corrective action; instead, the undisputed medical records indicate that Horsman had continuous access to medical personnel and

52

routinely received treatment for his conditions.  Finally, the undisputed medical records demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the correctional defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987). Summary judgment is therefore due to be granted in favor of defendants Bentley, Thomas, Daniels, McKee, Clemons, Hooks, Jamison and Lynam.  Furthermore, even had Horsman presented a proper basis for the claims lodged against these defendants, the medical records before the court indicate that health care personnel did not act with deliberate indifference to Horsman's medical needs.

(iii)  <u>Medical Defendants</u>.  To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that health care personnel acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).  Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by

*Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment.").

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S. Ct. 1970, 1977-79, 128 L. Ed. 2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n. 28 (11th Cir.1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of

facts signaling the need and an actual inference of required action from those facts."

*Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference."  *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'  *Estelle*, 429 U.S. at 105, 97 S. Ct. at 291; *Mandel*, 888 F.2d at 787.  Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'  *Rogers*, 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.  *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference).  Nor

> does a simple difference in medical opinion between the prison's medical
> staff and the inmate as to the latter's diagnosis or course of treatment support
> a claim of cruel and unusual punishment.  *See Waldrop*, 871 F.2d at 1033
> (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258

(citation and internal quotations omitted) (To show deliberate indifference to a serious

medical need, a plaintiff must demonstrate that [the] defendants' response to the need was

more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even

medical malpractice actionable under state law.").  Moreover, "as *Estelle* teaches, whether

government actors should have employed additional diagnostic techniques or forms of

treatment 'is a classic example of a matter for medical judgment' and therefore not an

appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d

at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion

as to how a condition should be treated does not give rise to a constitutional violation.");

*Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires

a different mode of medical treatment does not amount to deliberate indifference violative

of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison

medical personnel do not violate the Eighth Amendment simply because their opinions

concerning medical treatment conflict with that of the inmate-patient).  Self-serving

statements by a plaintiff do not create a question of fact in the face of contradictory,

contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530 (11th

Cir. 1990).

The affidavits filed by the medical defendants thoroughly address the claims made by Horsman alleging a lack of adequate medical treatment. *Supra* at 37-46. A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with treatment provided to Horsman relative to the instant claims of deliberate indifference. These evidentiary materials refute the self-serving, conclusory allegations set forth by Horsman.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by the medical defendants in addressing Horsman's medical conditions and supply of KOP medications did not violate his constitutional rights. The medical care Horsman received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. The allegations presented by Horsman fail to establish deliberate indifference by the medical defendants. *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545-1546 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability. In addition, an inmate's allegation that prison physicians did not

diligently pursue alternative means of treating condition "did not 'rise beyond negligence'. . . to the level of deliberate indifference."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that Horsman received treatment for his medical issues and had access to medical personnel throughout his confinement at Elmore.  It is likewise evident that the defendants rendered treatment to Horsman in accordance with their professional judgment.  Moreover, Horsman has failed to present any evidence which indicates the medical defendants knew that the manner in which they provided treatment created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record contains no evidence, significantly probative or otherwise, showing that the medical defendants acted with deliberate indifference to Horsman's medical needs.  Consequently, summary judgment is due to be granted in favor of the medical care provider and Dr. Hood.  *Carter*, 352 F.3d at 1350.

## F.  First Amendment Claims - Retaliation

Horsman alleges that defendant McKee removed him from his job as an inmate law clerk and placed him on a recycling job then subsequently placed him on kitchen duty in retaliation for his work in the law library.  Horsman further alleges that defendant McKee

and, by implication, defendant Daniels "transferred him to Limestone in retaliation" for filing this civil action on behalf of himself and other inmates. *Amendment to the Complaint - Doc. No. 34* at 2. The defendants deny these allegations and argue that the actions about which Horsman complains did not occur in retaliation for Horsman exercising any constitutionally protected right.

Initially, defendant McKee maintains that he did not have the authority to unilaterally issue a job change to Horsman as this action was undertaken by the job board at Elmore. *Exh. C to the Correctional Defendants' Special Report - Doc. No. 6-3* at 1; *Exh. B to the Correctional Defendants' Second Supplemental Special Report - Doc. No.* 57-2 at 2. Moreover, the record before the court demonstrates that correctional officials at Elmore had recently obtained information indicating that Horsman received payment for assisting another inmate in a legal matter, i.e., receipt of a money order in the amount of $56.00, *Amendment to the Complaint - Doc. No. 34* at 4, an action prohibited by institutional rules, thereby warranting the removal of Horsman from his job as an inmate law clerk.[10] The record further establishes that correctional officials re-assigned Horsman from his recycling job to kitchen duty upon the job board's receipt of a special needs form completed by medical personnel recommending placement of Horsman in a job other than his assignment to the Recycling Plant because his "asthma is made worse while in [the]

---

[10]As discussed *infra*, this type of behavior also provided a valid basis for Horsman's transfer from Elmore.

recycling center." *Exh. 2 to the Medical Defendants' Special Report - Doc. No. 7-2* at 34; *Exh. 1 to the Plaintiff's Amendment to the Complaint - Doc. No. 34-1* at 3.

As to the retaliatory transfer claim, the defendants assert that defendant McKee was not in any way involved with the decision to transfer Horsman. *Exh. C to the Correctional Defendants' Special Report - Doc. No. 6-3* at 1; *Exh. B to the Correctional Defendants' Second Supplemental Special Report - Doc. No.* 57-2 at 2. The defendants further argue that Horsman's transfer was not in retaliation for Horsman exercising his right of access to the courts; rather, the maintain that he was transferred in accordance with applicable prison rules and procedures.

Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405 (1974)]. As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id.*, at 404-05, 94 S. Ct. at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources . . . ." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987). Correctional officials are therefore "accorded latitude in the administration of prison affairs[,]" *Cruz v. Beto*, 405 U.S. 319, 321 (1972), which necessarily includes "the [inescapable] withdrawal or limitation of many [inmate] privileges and rights." *Pell v. Procunier*, 417 U.S. 817, 822

(1974) (quotation marks and citation omitted); *Bell v. Wolfish*, 441 U.S. 520, 546 (1979).

"In the First Amendment context, . . . some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Shaw v. Murphy*, 532 U.S. 223, 229 (2001), quoting *Pell*, 417 U.S. at 822. In accordance with this principle, an inmate's rights established under the First Amendment are not protected if allowing such protection is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822. Thus, while inmates retain a constitutional right protected by the First Amendment to freely exercise their right of access to the courts, this right is limited by the fact of incarceration and valid penological objectives such as maintaining institutional security and order. The law is well settled that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell*, 417 U.S. at 823; *Bell v. Wolfish,* 441 U.S. at 546 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). It is therefore clear that preservation of security and order within a correctional facility is essential to the facility's effective administration and constitutes both a compelling and substantial governmental interest. *Pell*, 417 U.S. at 823; *Lawson v. Singletary*, 85 F.3d 502, 512 (11th Cir. 1996); *Harris v. Chapman*, 97 F.3d 499, 504

(11th Cir. 1996).

"The first amendment prohibits state officials from retaliating against prisoners for exercising their right of free speech. *See, e.g.*, *Wright v. Newsome*, [795 F.2d 964, 968 (11th Cir. 1986)]. . . .  The gist of a retaliation claim is that a prisoner is penalized for exercising a right [protected by the First Amendment]." *Thomas v. Evans*, 880 F.2d 1235, 1241-42 (11th Cir. 1989); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).  "In prison, of course, first amendment rights are not absolute. *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).  Legitimate policies and goals of the correction system may justify restrictions limiting prisoners' [First Amendment] rights.  417 U.S. at 821." *Adams v. James*, 784 F.2d 1077, 1081 (11th Cir. 1986).

> A prisoner retains those First Amendment rights that are 'not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system.' *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (resist)) (internal quotation marks omitted). . . .   [P]rison authorities have a legitimate penological interest in the consistent enforcement of prison rules and . . . disciplining prisoners who attempt to coerce a guard into not enforcing prison rules is reasonably related to that interest.

*Hargis v. Foster*, 312 F.3d 404, 409-10 (9th Cir. 2002); *see also Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir. 1989).  The situation is somewhat complicated when the alleged act of retaliation is undertaken to assure compliance with prison rules as inmates often attempt to "inappropriately insulate themselves from [such] actions by drawing the shield of

retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied sub nom Palermo v. Woods*, 516 U.S. 1084 (1996).

To proceed on a claim for retaliation and withstand the entry of summary judgment, an "inmate must establish . . . three elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999).  With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred.  *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

Horsman alleges that the correctional defendants in changing his job assignments and effectuating his transfer from Elmore to Limestone retaliated against him for exercising his right of access to the courts, thus satisfying the first element of his retaliation claim. *Smith*, 532 F.3d at 1277.  The second element requires Horsman to demonstrate that these adverse actions "would likely deter a [prisoner] of ordinary firmness" from filing legal actions.  *Id*.  This "presents an objective standard and a factual inquiry."  *Id*.  The court

assumes *arguendo* that this standard has been met.  Nevertheless, Horsman fails to satisfy the third requisite element of a retaliation claim - a causal connection between his constitutionally protected activity and the adverse actions of the correctional defendants. The causal connection inquiry focuses on the "subjective motivation of the defendants[,]" *Thaddeus-X*, 175 F.3d at 399, and this court must therefore determine "whether the defendants were subjectively motivated to" undertake the challenged actions against Horsman for his engaging in legal activities.  *Smith*, 532 F.3d at 1278.  The subjective motivation issue is resolved by most courts under the burden-shifting formula set forth in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  This formula requires that the plaintiff first meet "his burden of establishing that his protected conduct was a motivating factor behind any harm" and then "the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399 (referencing the *Mt. Healthy* motive analysis).

It is essential that federal courts "carefully scrutinize retaliation claims" brought by prisoners challenging adverse actions of correctional personnel.  *Woods*, 60 F.3d at 1166. "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).  This is [necessary because prisoners'] . . .  claims of retaliation are . . . easily fabricated [and] pose a substantial risk

of unwarranted judicial intrusion into matters of general prison administration.  This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by showing "that his conduct was constitutionally protected and that this conduct ... was a 'motivating factor'" behind the adverse action of the defendant.  *Mt. Healthy*, 429 U.S. at 287.  Merely alleging the ultimate fact of retaliation, however, is insufficient.  *Cain v. Lane*, 857 F.2d 1139, 1142, n.6 (7th Cir. 1988); *Woods*, 60 F.3d at 1166.  Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to establishing retaliation.  *Morales*, 278 F.3d at 131; *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (Because prisoner retaliation claims are prone to abuse, "we are careful to require non-conclusory allegations.").  If an inmate meets his burden with appropriate evidence, the burden of production shifts to the defendant to show that he "would have reached the same decision . . . even in the absence of the protected conduct."  *Mt. Healthy*, 429 U.S. at 287.  "Under the *Mt. Healthy* approach, if the government official 'can prove that [he] would have taken the adverse action in the

absence of the plaintiff's protected conduct, [he] cannot be held liable.'" *Smith*, 532 F.3d at 1278 n.22 (quoting *Thaddeus-X*, 175 F.3d at 388 n.4).

The correctional defendants categorically deny Horsman's allegations of retaliation and emphatically aver that retaliation played no role in the challenged decisions. The defendants argue and the evidentiary materials contained in the record indicate that the adverse actions about which Horsman complains did not occur due to retaliation against Horsman for filing this or any other lawsuit. Instead, the defendants assert that these actions occurred for the following reasons: (i) a request by medical personnel that Horsman be assigned a job away from the Recycling Plant, (ii) to maintain security and preserve order through the enforcement of institutional rules, (iii) Horsman's history of charging other inmates for legal work, and (v) by Horsman's own admission, correctional officials receiving information indicating that Horsman had continued this practice while at Elmore.[11]

Horsman offers only his conclusory allegations of ultimate fact that the defendants retaliated against him for exercising his right of access to the court. These allegations are insufficient to defeat summary judgment. *Waddell*, 276 F.3d at 1279; *Holifield*, 115 F.3d at 1564, n.6. The record before the court, when viewed as a whole, does not support

---

[11]Additionally, the defendants assert that the transfer at issue transpired due to "an institutional warden swap" agreed upon on July 11, 2013, prior to the initiation of this case, *Exh. A to the Correctional Defendants' Third Supplemental Special Report - Doc. No. 67-1* at 1, and that such transfers often occur to maintain security and order in the prisons. *See Exh. A to the Correctional Defendants' Second Supplemental Special Report- Doc. No. 57-1* at 6.

Horsman's allegations and provides no basis on which a reasonable fact finder could fairly infer the requisite subjective motivating factor.  The facts and circumstances of this case simply do not support making such an inference as there is no probative evidence indicating that the defendants intended to retaliate against Horsman.  Thus, Horsman's retaliation claims falter on this element.

Moreover, even assuming a reasonable fact finder could infer the motivating factor element, it is clear under *Mt. Healthy* that correctional officials would have changed each of Horsman's respective job assignments regardless of his accessing the court because Horsman's actions in soliciting and/or receiving payment from other inmates for legal work performed on their behalf violated institutional rules and likewise clearly constituted an abuse of the position of inmate law clerk, *Turner*, 482 U.S. 91-92, and medical personnel issued a profile recommending that he be re-assigned from the Recycling Plant due to a health issue.  It is also apparent that correctional officials would have transferred Horsman despite his seeking access to this court as his transfer occurred due to an institutional swap completed between the relevant facilities' wardens in an effort to maintain security at Elmore which had been adversely affected by Horsman's activities with respect to his obtaining payment from other inmates for the preparation of legal work.  "Objective prison administrators standing in [the defendants'] shoes would assume that [allowing a violation of institutional rules] . . . would be noised about the prison's population and, if ignored,

could seriously impede their ability to maintain order and thus achieve the institution's penological objectives." *Smith*, 532 F.3d at 1279.  In light of the foregoing, the defendants are entitled to summary judgment on the First Amendment claims as Horsman fails to establish by appropriate evidence a causal relationship between any alleged protected activity and the adverse actions taken against him.  *Id*. at 1278-79.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The motions for summary judgment filed by the defendants be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be DISMISSED with prejudice.

4.  Costs be taxed against the plaintiff.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **October 20, 2014**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District

Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 6th day of October, 2014.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE